# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

DEAN GALLAHER, et al.,                    )
                                          )
           Plaintiffs,                    )
                                          )
-vs-                                      )     Case No. CIV-07-974-F
                                          )
GEORGE B. SALEM, et al.,                  )
                                          )
           Defendants.                    )

## ORDER

Before the court is Defendant George B. Salem's Motion for Summary Judgment (doc. no. 103). Plaintiffs have responded to the motion, and defendant has replied. Upon review of the parties' submissions, the court makes its determination.

Background

On June 20, 2002, plaintiff, D&T Consulting, Inc. ("D&T"), entered into an asset purchase agreement with GuideStar Health Systems, Inc. ("GuideStar") to sell its assets to GuideStar. The asset purchase agreement required plaintiffs, Dean Gallaher ("Gallaher") and Tresa Perkins-Gallaher ("Perkins-Gallaher"), who were officers and employees of D&T, to sign a non-compete agreement in favor of GuideStar. At the time both agreements were executed, and for a period of time thereafter, defendant, George B. Salem ("Salem"), was president and chief executive officer of GuideStar.

On September 4, 2007, plaintiffs commenced this action against various defendants, including Salem. In Plaintiffs' First Amended Original Complaint filed March 25, 2008, plaintiffs allege two claims against Salem. These claims assert common law fraud and conspiracy. Salem moves for summary judgment on both

claims on the grounds that the claims are barred by the applicable statute of limitations and are without factual or legal merit.

Standard of Review

Under Rule 56(c), Fed. R. Civ. P., summary judgment shall be granted if the record shows that, "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." The moving party has the burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In determining whether a genuine issue of a material fact exists, the evidence is to be taken in the light most favorable to the non-moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). All reasonable inferences to be drawn from undisputed facts are to be determined in a light most favorable to the non-movant. United States v. Agri Services, Inc., 81 F.3d 1002, 1005 (10th Cir. 1996). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials, demonstrating that there is a genuine issue for trial. Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir. 1983).

Relevant Facts

The following relevant facts are either undisputed or viewed in a light most favorable to plaintiffs.

GuideStar was formed by Salem in November of 1995.[1] The focus of GuideStar's business, in early 2002, was to provide administrative services for health

---

[1] Although there is no dispute between the parties that GuideStar was formed by Salem, the court notes that Salem, in his December 21, 2006 deposition, testified that Tullis Dickerson, a venture capital group, helped form GuideStar. Ex. 3 to Salem's motion, p. 18, ll. 5-12.

benefits for individual corporations, including the review and processing of insurance claims. Ex. 2 to Salem's motion, ¶ 6; Ex. 3 to Salem's motion, p. 8, ll.20-23, p. 9, 1.1.

As with most corporations, GuideStar had a board of directors which was consulted on and approved major events; however, day-to-day business decisions relating to GuideStar were made by GuideStar's corporate leadership, which included Salem. Ex. 2 to Salem's motion, ¶¶ 7, 8.

In April of 2002, negotiations began between plaintiffs and GuideStar about a possible acquisition of D&T by GuideStar. At that time, D&T was in the business of providing third party administration services to companies and employer groups for self-insured and dental benefit plans. Gallaher was chief executive officer and a 50% owner of D&T. Perkins-Gallaher was president and a 50% owner of D&T. During the negotiations, all parties were represented by counsel of their choosing. Ex. 2 to Salem's motion, ¶¶ 5-7; Ex. 7 to Salem's motion; Ex. A to plaintiffs' response, ¶ 4; Ex. B. to plaintiffs' response, ¶ 4.

Salem, who was president and chief executive officer of GuideStar, came to the offices of D&T on two occasions. On the second visit, Salem handed Gallaher and Perkins-Gallaher a document entitled "Employee Manual." The document was provided to make representations regarding the background, assets and business of GuideStar. One of the statements contained in the "History" section of the document provided: "In December 1997, GuideStar completed an equity offering which consisted of private placement of Class B preferred stock, with a provision to access a total of 55 million dollars." Ex. A to plaintiffs' response, ¶ 9; Ex. B to plaintiffs' response, ¶ 9; Ex. 1 to Salem's motion.

Gallaher made inquiries to Salem regarding the ownership and assets of GuideStar. Salem stated to Gallaher and Perkins-Gallaher that he was founder,

president and chief executive officer of GuideStar.  Ex. A to plaintiffs' response, ¶ 10; Ex. B to plaintiffs' response, ¶ 10.

As previously stated, GuideStar and plaintiffs executed an asset purchase agreement on June 20, 2002.  Under the asset purchase agreement, D&T agreed to sell, and GuideStar agreed to buy, certain assets of D&T.  The consideration to be paid by GuideStar for D&T's assets was the assumption of certain liabilities, the payment of $200,000.00 over a period of two years,[2] and the payment of certain assumption fees.  Ex. 7 to Salem's motion, ¶ 3.1(a).

The asset purchase agreement required Gallaher and Perkins-Gallaher to sign a non-compete agreement.  The non-compete agreement required Gallaher and Perkins-Gallaher to refrain from engaging or participating or having an economic interest in any competing business or rendering third party administrative services for a period of 18 months following the execution of the non-compete agreement.  Ex. 7 to Salem's motion, ¶ 7.1(e); Ex. B to Ex. 7 to Salem's motion.

Several months after the asset purchase was completed and the non-compete agreement was executed, a business decision was made to begin looking for someone to assume the business of GuideStar.  Negotiations with the first potential buyer did not result in a completed transaction.  Negotiations with the second buyer were successful, and in April of 2003, GuideStar was sold to an entity known as Maven Holdings Corporation ("Maven").  Ex. 2 to Salem's motion, ¶¶ 19-21.

The sale of GuideStar to Maven was an arms' length transaction and both business entities were represented by counsel of their own choosing.  Neither Maven nor Maven's principal, Prasad V. Potluri, was known to GuideStar or Salem prior to

---

[2]  According to the asset purchase agreement, GuideStar was to pay the $200,000 sum as follows: $50,000 at closing on July 1, 2002; $25,000 on August 31, 2002; $25,000 on December 31, 2002; $50,000 on June 20, 2003; and $50,000 on June 30, 2004.  Ex. 7 to Salem's motion, ¶ 3.1(b).

4

the execution of the asset purchase agreement and non-compete agreement. Negotiations did not commence between GuideStar and Maven/Potluri until after the execution of the asset purchase agreement and the non-compete agreement. Ex. 2 to Salem's motion, ¶¶ 22-23.

As part of the due diligence that preceded the sale of GuideStar to Maven, GuideStar made Maven and Potluri fully aware of all obligations of GuideStar, including GuideStar's payment obligations to D&T. Ex. 3 to Salem's motion, p. 53, ll. 11-19.

At the time GuideStar was sold to Maven, GuideStar was current on its payment obligations to D&T under the asset purchase agreement. After GuideStar was acquired, Maven defaulted on the payment obligations. Ex. 2 to Salem's motion, ¶ 24.

On September 8, 2003, D&T commenced an action in state court against GuideStar for breach of the asset purchase agreement. GuideStar removed the action to this court on September 30, 2003, D&T Consulting, Inc. v. GuideStar Health Systems, Inc., Case No. CIV-03-1373-T. GuideStar moved to compel arbitration of D&T's claim and stay the action pending arbitration proceedings. Over D&T's objection, GuideStar's motion was granted. D&T thereafter commenced arbitration proceedings. When GuideStar failed to pay required arbitration fees, the arbitration proceeding was terminated. D&T sought leave to vacate the stay and reopen the case, which was granted. D&T filed a motion for summary judgment, to which GuideStar did not respond. The court entered an order granting summary judgment on the claim for breach of the asset purchase agreement. On January 26, 2005, a judgment was entered in favor of D&T and against GuideStar for breach of the asset purchase

agreement in the amount of $315,504.00, plus prejudgment interest of $29,041.60. Case No. CIV-03-1373-T, doc. nos. 1, 8, 21, 32, 33, 36, 39 and 40.[3]

On February 14, 2005, Gallaher contacted Salem by telephone. During the conversation, Gallaher told Salem he had obtained a judgment against GuideStar and told Salem he was going to have to sue Salem because he was the only individual he could find. Salem wrote a memo concerning the substance of the telephone call and provided a copy of the memo to his legal counsel. Ex. 2 to Salem's motion, ¶¶ 25, 26.

On May 26, 2006, D&T issued a post-judgment subpoena duces tecum to Salem. An objection and motion to quash was filed by Salem on June 8, 2006 in the United States District Court for the Northern District of Alabama, D&T Consulting, Inc. v. GuideStar Health System, Inc., Case No. 06-mc-1120-UWC. On November 7, 2006, the court denied Salem's motion to quash and required Salem to submit to a post-judgment deposition of two hours or less.[4] Salem's deposition was taken on December 21, 2006. Gallaher was present at the deposition but Gallaher-Perkins was not. Ex. 3 to Salem's motion, pp. 1,5.

In the deposition, D&T's counsel questioned Salem about the "Employee Manual." In regard to the manual, Salem testified as follows:

> Q.    Okay. Let's look at the history section. Read if you could to yourself just page 3, and I'll just ask you a general question when you have gone through it.
>
> A.    All right.

---

[3]  The court takes judicial notice of these pleadings and referenced facts. Rule 201, Fed. R. Evid.; St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp., 605 F.2d 1169, 1172 (10th Cir. 1979) ("[A] court may . . . take judicial notice, whether requested or not . . . of its own records and files, and facts which are part of its public records.").

[4]  The court also takes judicial notice of the pleadings and referenced facts in the Alabama action. Rule 201, Fed. R. Evid.; St. Louis Baptist Temple, Inc., 605 F.2d at 1172.

Q.      Having read through page 3, are there any representations on this page that you believe are inaccurate or untrue in any way?

A.      The representation in the fourth area.

Q.      What is that representation?

A.      The representation about the equity offering, fifty-five million.  The fifty-five million was never put – the full amount was never put in the company.

Q.      Okay.  And when did you become [aware] that the fifty-five million was never put into the company?

A.      The fifty-five million was monies to be earmarked that venture capital firms were made invested in companies. They invested in segments based upon performance, based upon other criteria that they might have.  A fraction of that was put in the company although other money was earmarked for the company. At the time this was written, that the earmarked monies were there but the entire money was not put into the company.

* * * *

Q.      Did you ever tell Dean Gallaher that this fourth statement that in December of 1997 GuideStar completed an equity offering which consisted of private placement of class B preferred stock with a provision to access a total of fifty-five million, did you ever tell Mr. Gallaher at any time after the transaction or before the transaction that this statement, in fact, was not true?

A.      The statement is true.  Read the statement.  It says that there will be access.  It doesn't mean the money was put into the company.

Q. All right. Did you ever clarify the statement in any way to Mr. Gallaher?

A. The statement is perfectly clear.

Q. All right. How much of this fifty-five million was actually accessed by GuideStar?

A. Ten million.

Q. Did ten million dollars somehow go into the coffers of GuideStar at some time?

A. Yes.

Salem deposition, p. 28, ll. 4-23; p. 29, ll. 13; p. 30, ll. 11-23, p. 31, ll. 1-15.

In his deposition, Salem was also questioned as to the ownership of GuideStar stock and the sale of GuideStar to Maven. Salem testified as follows:

Q. At the time or just prior to any transaction involving Maven Corporation who were the owners of the GuideStar Health Systems stock?

A. They were venture capital groups.

Q. What are the names of those venture capital groups?

A. Tullis Dickerson.

* * * *

A. Oxford Bioscience Partners.

* * * *

A. Trident Ventures.

8

\* \* \* \*

A.    Alex Brown & Sons . . . Charter Ventures.

\* \* \* \*

Q.    Had you sent any feelers out saying that you were interested in selling GuideStar?

A.    We had considered it at the time.

\* \* \* \*

Q.    And when you say we had considered it, who was considering it?

A.    Well, the board of the corporation.

Q.    At that time who was on the board?

A.    Representatives from the venture capital firms.

\* \* \* \*

Q.    Did you seek the consent of any of these entities for the sale of GuideStar to Maven?

A.    Seek the consent would be a mischaracterization. Maven approached the company and the investors.  At the same time the investors made the decision to make the sale.

Q.    All right.  Were you at the time of the sale an owner of any of the common shares of GuideStar Health Systems?

A.    My ownership of shares would have been less than one percent at the time of sale.

Q.    Had it at one time been greater than less than one percent?

A.    At one time it was.

Q.    What was the highest it ever got?

A.    Fifteen percent.

                              * * * *

Q.    How did you go from fifteen down to one?

A.    Subsequent securities offerings [;] through dilution my ownership share was reduced.

                              * * * *

Q.    When and where did you meet Prasad Potluri for the first time?

A.    He came to our offices.

Q.    About when?

A.    Several weeks after the original meeting.

                              * * * *

Q.    What did he tell you?

A.    He reviewed his plan for building a corporation.

Q.    I guess at some point you then communicated these meetings and this interest to your board of directors?

A.    Yes.

Q.    Who did you tell?

A.    The entire board.

Q.    In a board meeting?

A.    I called each one individually and then GuideStar had meetings.

* * * *

Q.    Were the venture capital firms shareholders in Maven?

A.    No.

Q.    Did the venture capital firms come to you and say look, George, you're the guy that got us into this.  What is going on with this Maven Corporation?  We are not seeing the kind of income we expected?  Did they ever say that?

A.    No.  I was not the guy that got them into this.

Q.    Who was?

A.    It was board decision.  The board as a whole made the decision to do the transaction.  It was my obligation at the time when I was serving as the president to bring any opportunities or potential sales or any transaction possibilities of that type to the board.  And no, they did not come to me.

Ex. 3 to Salem's motion, p. 15, ll. 17-23; p. 16, ll. 2, 8, 14, 18-19; p. 17, 7-23; p. 18, ll1-4, 20-23; p. 19, l. 1; p. 39, ll. 13-17; p. 40, ll. 1-8; p. 45, ll. 18-23; p. 46, ll. 1-15; p. 128 l. 23; p. 129, ll. 1-19.

As stated, in Plaintiffs' First Amended Original Complaint, plaintiffs allege claims against Salem for common law fraud and conspiracy.  In regard to the fraud

claim, plaintiffs allege that Salem made a material misrepresentation by providing them the statement from the "History" section in the "Employee Manual" that read "In December 1997, GuideStar completed an equity offering which consisted of private placement of Class B preferred stock, with a provision to access a total of 55 million dollars." They also allege that Salem made material non-disclosures that GuideStar was owned and controlled by venture capital firms rather than himself, and that at the time of the D&T agreements, he had already discussed with Prasad Potluri the sale of GuideStar to Maven. Plaintiffs allege that the misrepresentation and non-disclosures were not discovered until Salem's deposition in the Alabama case. According to plaintiffs, Salem revealed for the first time that (1) through its private placement of class B preferred stock in December of 1997, GuideStar did not have access to a total of 55 million dollars; (2) during the operation of GuideStar and its interactions with plaintiffs, venture capital firms, and not Salem, were controlling the business activities of GuideStar; and (3) at the time of his interactions with plaintiffs, Salem had already engaged in discussions for the sale of Guidestar (and assets of D&T) to Maven. First Amended Original Complaint, doc. no. 44, pp. 28-45.

As to the conspiracy claim, plaintiffs allege that Salem conspired with others to deceive plaintiffs into transferring the assets of D&T to them so that they could use those assets for their own benefit while depriving plaintiffs of the consideration for the transfer. Plaintiffs further allege that Salem conspired with others for the illegal purpose of completing a fraudulent conveyance of the assets of GuideStar and D&T to Maven. First Amended Original Complaint, doc. no. 44, pp. 46-47.

Discussion

I.     Statute of Limitations

Under Oklahoma law, "an action for relief on the ground of fraud" shall be brought within two years "after the cause of action shall have accrued," and "the cause of action in such case shall not be deemed to have accrued until the discovery of the fraud." 12 O.S. 2001 § 95(3). "The phrase '[u]ntil the discovery of the fraud' does not necessarily mean until the party has actual notice of the fraud." Walker v. Walker, 310 P.2d 760, 763 (Okla. 1957). Rather, "[f]raud is deemed to be discovered . . . when in the exercise of reasonable diligence it could have been discovered." Id. "The question of when fraud is discovered or should have been unearthed with the exercise of ordinary diligence is one of fact dependent on the surrounding circumstances, the relationship of the parties, and all other elements peculiar to the cause." Smith v. Baptist Found. of Oklahoma, 50 P.3d 1132, 1138 (Okla. 2002). Plaintiffs' fraudulent conspiracy claims are also governed by the two-year statute of limitations of section 95(3) and must be brought within two years of discovery of the fraud. Paxton v. Hyer, 87 P.2d 938, 940 (Okla. 1939).

Salem, in his motion, contends that plaintiffs' fraud and conspiracy claims are time-barred. As for the fraud claim, Salem argues that the amended complaint and plaintiffs' affidavits are clear that the misrepresentation and non-disclosures of which plaintiffs complain occurred, if at all, prior to the execution of the asset purchase agreement on June 20, 2002. The record is equally clear, Salem asserts, that this action was filed over five years from the date of the agreement's execution. According to Salem, plaintiffs cannot invoke the discovery rule to save their fraud claim because plaintiffs were "on notice" of their claim as early as April of 2003. Salem contends that in or about April 2003, plaintiffs knew that Maven had purchased

13

the outstanding stock of GuideStar and knew in mid-2003 that Maven would not satisfy the remaining payment obligations owed to D&T under the asset purchase agreement. They additionally knew, Salem asserts, that D&T had sued GuideStar for breach of the asset purchase agreement in September of 2003 and that plaintiffs were suffering damages at that time. In addition, Salem contends that based upon the telephone conversation between Gallaher and Salem in February of 2005, it is clear that plaintiffs knew they were going to sue Salem at least two and one-half years before their suit was actually filed. Salem contends that given the information that was available to them, plaintiffs simply waited to long to sue him.

In addition, Salem argues that while plaintiffs claim in their amended complaint that the alleged fraud was not discovered until Salem's deposition on December 21, 2006, the evidence shows that plaintiffs actually did not discover any fraudulent misrepresentation or non-disclosure during that deposition. First, according to Salem, the representation in the Employee Manual regarding GuideStar's access to 55 million dollars in capital, which plaintiffs claim to be false, is true. Salem contends that he did not testify in the deposition that the representation is false. Rather, he testified that the statement is true. Moreover, Salem argues that his affidavit and the affidavit of Timothy Thornton, Chief Operating Officer/Chief Finance Officer for GuideStar, clearly show that GuideStar entered into a transaction in December of 1997 which resulted in GuideStar having access to 55 million dollars in capital. Salem argues that plaintiffs have no evidence which demonstrates that GuideStar did not have access to 55 million dollars in capital from that transaction. Accordingly, Salem argues that plaintiffs cannot claim that they discovered a fraudulent misrepresentation during his deposition with respect to the representation in the Employee Manual regarding GuideStar's access to 55 million dollars in capital. Therefore, Salem argues that

14

plaintiffs cannot rely upon the discovery rule and, consequently, that the fraud claim based upon the alleged fraudulent misrepresentation is time-barred.

Next, Salem asserts that the first alleged non-disclosure purportedly discovered by plaintiffs – GuideStar was owned and controlled by venture capital firms – was not discovered during Salem's deposition.  Salem contends that he did not testify in his deposition that GuideStar was owned and controlled by its investors.  In addition, to the extent that plaintiffs are claiming they did not know GuideStar had investors, Salem argues that plaintiffs' claim in insupportable,  because plaintiffs knew from the statement in the Employee Manual that GuideStar had an influx of capital from  the issuance of stock.  Likewise, to the extent that plaintiffs  claim that they did not know GuideStar had a board of directors, Salem argues that plaintiffs' claim is without merit because the  asset purchase agreement shows that it was approved by GuideStar's board of directors.  Salem also asserts that the testimony elicited during the deposition about the board of directors shows no unusual control of GuideStar by the board of directors.   Further,  Salem  points  out  that  during  his  deposition,  he  was  never questioned regarding the role of the board of directors in the day-to-day business of the company.  Salem therefore argues that plaintiffs made no discovery during his deposition of the alleged non-disclosure that GuideStar was owned and controlled by venture capital firms and cannot rely upon the discovery rule to save the fraud claim based upon the first alleged non-disclosure.

Finally, Salem contends that, during his deposition, plaintiffs  could not have discovered  the  second  alleged  non-disclosure  –  that  GuideStar  had  commenced discussions with Maven regarding the sale of GuideStar prior to the execution of the asset purchase agreement between GuideStar and D&T.  Salem contends that no such testimony was ever elicited during his deposition.  Moreover, according to Salem, the

uncontroverted evidence in the record refutes the allegation of non-disclosure. Salem contends that neither Maven nor Potluri was known to Salem or GuideStar prior to the execution of the asset purchase agreement with D&T. Salem maintains that the uncontroverted evidence shows that he did not begin negotiations with Potluri until several months after the asset purchase agreement's execution. Salem contends that plaintiffs have no evidence to the contrary. Therefore, because plaintiffs did not discover the second alleged non-disclosure at Salem's deposition, Salem contends that plaintiffs cannot rely upon the discovery rule for their fraud claim based upon the second alleged non-disclosure.

As to the conspiracy claim, Salem contends that plaintiffs knew, in April 2003, that Maven acquired GuideStar and in mid-2003 knew that Maven was not going to comply with the payment obligations under the asset purchase agreement. Plaintiffs also knew, Salem asserts, that they were damaged. Salem contends that plaintiffs clearly had sufficient information from those facts to put them on notice of their claim that Salem and others had conspired to obtain the assets of D&T for the illegal purpose of fraudulently conveying those assets to Maven. To the extent that plaintiffs attempt to rely upon the alleged misrepresentation and non-disclosures to save their conspiracy claim, Salem contends that none of the alleged conduct is relevant to the prosecution of the conspiracy claim and cannot be use to extend the accrual date for the conspiracy claim.

Plaintiffs, in response, contend that the discovery rule applies to their fraud and conspiracy claims. They contend that in both the amended complaint and in their affidavits they have clearly asserted that they did not discover any fraud until Salem's deposition was taken in 2006. According to plaintiffs, the fact that they knew GuideStar had breached the obligation to pay D&T for the assets and that they were

16

damaged did not put them on notice that the representations as to the basis for the GuideStar/D&T transaction - access to 55 million dollars in capital - were false and misleading.  Plaintiffs contend that had they known GuideStar would not have access to 55 million dollars and was not a major ongoing company, they would not have sold D&T or entered into the non-compete agreement.  They contend that they did not know GuideStar did not have access to the 55 million dollars until Salem's deposition. They also contend that they did not know until Salem's deposition that Salem did not control the day-to-day operations of GuideStar as he had represented during negotiations with plaintiffs.  As to the February 2005 telephone conversation, plaintiffs contend that Gallaher did not have any knowledge of the alleged fraud at that time and thus did not raise any issue of fraud during that conversation.  Plaintiffs maintain that if Gallaher had known of the alleged fraud, he would have mentioned it during that conversation.  Plaintiffs contend that there is an issue of fact as to when they acquired information which would have led them to the truth revealed by Salem in his deposition.

Upon review, the court concludes that the fraud claim, based upon the alleged misrepresentation, is time-barred.  The evidence in the record reveals that the alleged misrepresentation was made prior to June 20, 2002, the date of the execution of the asset purchase agreement.  This lawsuit was filed on September 4, 2007.  The court concludes that plaintiffs cannot rely upon the discovery rule to extend the accrual of the fraud claim from prior to June 20, 2002 until December 21, 2006.  Although Salem in the deposition initially indicated that the statement from the Employee Manual was inaccurate and untrue because the 55 million dollars was not put into the company, he testified, upon further questioning, that the statement was true in that the statement provided that "there will be access." Ex. C to Salem's motion, p. 30, ll. 23,

17

p. 31, l. 1.  Salem has also presented other evidence, uncontroverted by plaintiffs, that the statement, as made, is true.  On the basis of the deposition testimony and the other evidence that plaintiffs have not controverted, the court concludes that no reasonable jury could find that plaintiffs discovered, at Salem's  deposition, a fraudulent misrepresentation made in the Employee Manual.  Therefore, plaintiffs are not entitled to invoke the discovery rule to extend the accrual date of the fraud claim until December 21, 2006.  Because plaintiffs cannot rely upon Salem's deposition to extend the accrual date of the fraud claim, the court finds that the fraud claim, based upon the alleged misrepresentation, is barred by the applicable two-year statute of limitations.

The court finds that the fraud claim, based upon the alleged  non-disclosures, is also time-barred.  The evidence in the record indicates that, as with the alleged misrepresentation, the alleged non-disclosures[5] were made prior to June 20, 2002.  The court agrees with Salem that plaintiffs cannot rely upon the discovery rule to extend the accrual date of their fraud claims to December 21, 2006.  Plaintiffs maintain that Salem represented to them during negotiations that he controlled the day-to-day operations of GuideStar and that Salem, in the deposition, revealed that he had no such control.  The deposition testimony does not reveal that during the operation of GuideStar and its interactions with plaintiffs, the venture capital firms controlled the business activities of GuideStar.  There is no testimony regarding control over the day-to-day affairs of GuideStar.  The testimony relied upon by plaintiffs only concerns the identification of persons comprising the board of directors and the involvement of board of directors and venture capital firms in the sale of GuideStar to Maven.  The evidence in the record demonstrates that the Salem and

---

[5]  As stated, these non-disclosures are that GuideStar was owned and controlled by venture capital firms rather than Salem and that Salem had already engaged in discussions with Potluri for the sale of Maven to GuideStar prior to the GuideStar's acquisition of D&T

others in the corporate leadership controlled the day to day activities of GuideStar. The court concludes that no reasonable jury could conclude that Salem's deposition reveals that the venture capital firms controlled the business activities of GuideStar. Furthermore, the deposition testimony is silent as to when the negotiations between GuideStar and Maven commenced.   There is no testimony in the deposition to the effect that discussions between Salem and Potluri commenced prior to the acquisition of D&T.   The uncontroverted evidence in the record shows that the negotiations between GuideStar and Maven occurred after the execution of the asset purchase agreement.

The court concludes that the conspiracy claim is time-barred.   In the First Amended Original Complaint, plaintiffs allege that Salem and others conspired to deceive plaintiffs into transferring the assets of D&T to them so that they could use the assets for their own benefit while depriving plaintiffs of their consideration for the transfer and that Salem and others conspired with one another for the illegal purpose of completing a fraudulent conveyance of the assets of GuideStar and D&T to Maven. The evidence shows that plaintiffs knew in or about April of 2003 that Maven had acquired the assets of GuideStar, including the D&T assets; that in mid-2003 Maven had defaulted on the payment obligations under the asset purchase agreement between D&T and GuideStar and that in mid-2003 plaintiffs were damaged.   The court concludes that plaintiffs, in mid-2003, had acquired "sufficient information which, if pursued, would lead to the true condition of things" and constitutes "sufficient knowledge to start the running of the statute of limitations." Daugherty v. Farmers Co-op Ass'n, 689 P.2d 947, 950 - 51 (Okla. 1984).   For the reasons previously discussed with respect to the fraud claim, the discovery rule is of no avail to plaintiffs with respect to the conspiracy claim.

Merits of the Fraud and Conspiracy Claims

Aside from his contentions with respect to the statute of limitations, Salem contends that summary judgment is appropriate as to the merits of the fraud and conspiracy claims. Salem asserts that there was no fraudulent conduct on his part. The evidence, Salem maintains, shows that the statement in the Employee Manual regarding access to capital is true. Also, Salem contends that the evidence shows no material non-disclosures. Salem asserts that the evidence shows that the board of directors of GuideStar did not control the day-to-day activities of GuideStar but was only involved in major decisions affecting the corporation. In addition, Salem contends that the evidence shows that the negotiations between GuideStar and Maven did not commence until months after the execution of the asset purchase agreement. Salem argues that plaintiffs have no evidence to support their conspiracy claim. He argues that the transactions between GuideStar and D&T and GuideStar and Maven were arms' length transactions. Salem maintains that GuideStar paid all sums due to D&T prior to the sale to Maven and that prior to the sale to Maven, GuideStar disclosed to Maven GuideStar's contractual obligation to D&T. Salem contends that there is no evidence in the record that Salem with others engaged in any criminal or unlawful act or did a lawful act by criminal or unlawful means.

Plaintiffs contend that Salem admitted in his deposition that the representation regarding the 55 million dollar capitalization was inaccurate or untrue and that venture capital firms controlled the daily activities of GuideStar. Plaintiffs assert that had they known that the 55 million dollars had not been infused into the company or that the venture capital firms controlled GuideStar's daily activities, they would not have entered into the subject agreements. Plaintiffs contend that the evidence shows that Salem and other defendants conspired to create the image of a company that was

20

heavily capitalized and able to do business in Oklahoma's third-party administration market, when such was not the case.

The court, upon review, concludes that plaintiffs have failed to present sufficient evidence to raise a genuine issue of material fact as to the fraud and conspiracy claims. The court finds that plaintiffs have failed to proffer evidence from which a jury could reasonably conclude that the statement in the Employee Manual was a false statement. As stated, while Salem testified initially that the statement was inaccurate or untrue, he later clarified that the statement was true. Salem has presented evidence, unconverted by plaintiffs, that the statement was true. As to the alleged non-disclosures, plaintiffs have failed to present adequate evidence that the venture capital firms controlled GuideStar's daily activities or that negotiations between GuideStar and Maven began prior to the execution of the asset purchase agreements. The court concludes that there is insufficient evidence for a reasonable jury to find in favor of plaintiffs on the fraud claim. The court concludes that Salem is entitled to summary judgment on the fraud claim.

The court additionally find that plaintiffs have failed to present sufficient evidence for a reasonable jury to find in favor of plaintiffs on the conspiracy claim. Under Oklahoma law, a civil conspiracy consists of a combination of two or more persons to do an unlawful act, or to do a lawful act by unlawful means. Brock v. Thompson, 948 P.2d 279, 294 (Okla. 1997); Clark v. Sloan, 37 P.2d 263 (Okla. 1934). Unlike the criminal counterpart, civil conspiracy itself does not create liability. To be liable the conspirators must pursue an independently unlawful purpose or use an independently unlawful means. Brock, 948 P.2d at 294; *see also*, Schovanec v. Archdiocese of Oklahoma City, 188 P.3d 158, 175 (Okla. 2008) ("'an actionable conspiracy must consist of wrongs that could have been actionable against the

individual conspirators'") (quoting <u>Closs v. Goose Creek Consol. Indep. School Dist.</u>, 874 S.W.2d 859, 872 (Tex. App. - Texarkana 1994, no writ)).  In this case, plaintiffs have failed to proffer evidence  sufficient to raise a genuine issue of material fact as to the commission of an unlawful act or a lawful act by unlawful means.  As previously found, plaintiffs have failed to present sufficient evidence from which a reasonable jury could find in favor of plaintiffs on the fraud claim.  Therefore, the court concludes that Salem is entitled to summary judgment on plaintiffs' conspiracy claim.

<u>Conclusion</u>

Based upon the foregoing, Defendant George B. Salem's Defendant George B. Salem's Motion for Summary Judgment (doc. no. 103), is **GRANTED**.

DATED: August 20, 2009.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

07-0974p040(pub).wpd